**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NITROCREAM, LLC

Plaintiff,

v.

CHILL-N NITROGEN ICE CREAM FRANCHISING LLC, d/b/a CHILL-N NITROGEN ICE CREAM and/or CHILLN7 NITROGEN ICE CREAM, CHILL-N ICE CREAM LLC,

Defendants.

No.: 1:25-cv-22836-DPG

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. CLAIM CONSTRUCTION PRINCIPLES ........ 1

III. AGREED UPON CLAIM CONSTRUCTIONS ........ 2

IV. LEVEL OF ORDINARY SKILL IN THE ART ........ 2

V. DISPUTED CLAIM TERMS ........ 3

**A.** Claim Term 1: ***“Ice Cream Product”*** ........ 3

**B.** Claim Term 2: ***“Control Valve”*** ........ 3

**C.** Claim Term 3: ***“Selectively Dispense”*** ........ 5

**D.** Claim Term 4: ***“Line”*** ........ 7

**E.** Claim Term 5: ***“Vapor”*** ........ 8

**F.** Claim Term 6: ***“Cryogenic Vapor”*** ........ 11

**G.** Claim Term 7: ***“Bottom Surface”*** ........ 12

**H.** Claim Term 8: ***“The bottom surface being configured and dimensioned to support the container above the work surface”*** ........ 13

**I.** Claim Term 9: ***“Mixing sufficient liquefied gas to surround at least most of the container”*** ........ 14

**J.** Claim Term 10: ***“Deflecting laterally”*** ........ 16

**K.** Claim Term 11: ***“Deflector”*** ........ 18

VI. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

*Markman v. Westview Insturments, Inc.*, 52 F. 3d 967 (Fed. Cir. 1995)…………………………………...1

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351(Fed. Cir. 2008)... 1, 2, 3, 9, 10, 11, 15

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)…………………………………………………1, 2

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576 (Fed. Cir. 1996)………………………………………. 1

*Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003)……………………………………2, 4

*TevaPharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 135 S. Ct. 831, 190 L. Ed. 2d 719 (2015)……...2, 9

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)…………………2

*MDS (Can.), Inc. v. RAD Source Techs., Inc.*, 720 F.3d 833 (11th Cir. 2013)……………………………...3

*AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325 (Fed. Cir. 2021)……………………………………5

*Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320 (Fed. Cir. 2015)…………………………………………5

*Aptalis Pharmatech,Inc. v. Apotex Inc.*, 718 F. App'x 965 (Fed. Cir. 2018)…………………………………5

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005)…………………………………………………...5

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995)…………………………………5

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337 (Fed. Cir. 2001)………………………7

*Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1281 (Fed. Cir. 2009)………………………………………………7

*E.I. Du Pont*, 849 F.2d 1433 (Fed. Cir. 1988)……………………………………………………………...13

## I. INTRODUCTION

This Brief addresses the construction of fifteen (15) terms of U.S. Patent No. 7,455,868 (the "'868 Patent"). Pursuant to the Court's Scheduling Order [D.E. 70], on December 15, 2025, the Parties exchanged a list of claim terms warranting claim construction, and on January 30, 2026, the Parties exchanged proposed claim constructions intrinsic and extrinsic evidence supporting their respective constructions. *See* Exhibit A. Of those fifteen terms, eleven (11) remain disputed because the Parties proposed different constructions. *Id*. Disputed terms are found throughout the '868 Patent Claims, but Claims 1, 7, and 14 are representative and contain all of the disputed terms.

## II. CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a matter of law. *Markman v. Westview Insturments, Inc.*, 52 F. 3d 967, 979 (Fed. Cir. 1995) (*en banc*) aff'd, 517 U.S. 370 (1996). "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro*, 521 F.3d at 1360. A claim term is generally given its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art ['POSITA'] in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*), unless there is a reason to depart from that, such as disclaimer or disavowal. The claim language itself is where the claim construction inquiry begins. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The court may consider the words of both "the asserted and nonasserted claims to define the scope of the patented invention." *Id*. Next, the court must consider the specification and prosecution history of each asserted patent, which is "the single best guide to the meaning of a disputed term" and is "[u]sually dispositive."

*Phillips*, 415 F.3d at 1315. However, "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro,* 521 F.3d at 1361. In fact, claim terms are not always afforded their ordinary meaning "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003). That said, the Supreme Court has made clear that there are cases where a district court must "look beyond the patent's intrinsic evidence … and consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *TevaPharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331, 135 S. Ct. 831, 190 L. Ed. 2d 719 (2015).

**III. AGREED UPON CLAIM CONSTRUCTIONS**

As previously mentioned, the Parties exchanged proposed claim constructions. Exhibit A. The Parties proposed that the terms: 1. "Cryogenic Liquefied Gas" or "Liquified Gas;" 2. "Support;" 3. "Perimeter;" and 4. "Container" be afforded their "plain and ordinary meanings." *Id.* As such, a claim is generally given its "ordinary meaning" and when that meaning is undisputed, a district court may properly decline to construe such a claim. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012). Therefore, Defendants' do not address these terms herein and request that the Court decline to construe these terms.

**IV. LEVEL OF ORDINARY SKILL IN THE ART**

Defendants assert that, at the time of the invention of the '868 Patent, a person of ordinary skill in the art (POSITA) in the relevant field would have had one, or a combination of, the

following: (a) a four-year degree in mechanical engineering, chemical engineering, food engineering, or a related engineering or technical field, and at least 2–4 years of experience designing, operating, or maintaining food processing systems that rely on or make use of cryogenic liquids or gases; (b) at least 3–5 years of hands-on experience working with cryogenic liquid or gas systems in food production; or (c) an advanced degree in a relevant engineering or food science discipline with at least 1–2 years of experience designing, operating, or maintaining food processing systems that rely on or make use of cryogenic liquids or gases. Defendants' expert, Dr. Kevin Keener, meets or exceeds these requirements.

## V. DISPUTED CLAIM TERMS

### A. Claim Term 1: ***"Ice Cream Product"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| Plain and Ordinary Meaning | traditional ice cream, sherbet, soft ice cream, frozen yogurt, gelato, soy-based ice cream, and milkshakes | Claims 1, 16, 19 [D.E. 74, Ex. A], Claims 3, 11 [D.E. 74, Ex. B] |

District courts are not required to construe every limitation in a claim, and must only do so if there is a fundamental dispute. *O2 Micro*, 521 F.3d at 1362-63. As can be seen in Exhibits B and C, the Parties have not raised a fundamental dispute in either their infringement, or their non-infringement and invalidity contentions regarding the scope of this term. Ultimately, this term involves little more than the application of a widely accepted meaning of commonly understood words. *MDS (Can.), Inc. v. RAD Source Techs., Inc.*, 720 F.3d 833, 846 (11th Cir. 2013)

### B. Claim Term 2: ***"Control Valve"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| Plain and ordinary, but excluding any control valve that is "controlled based on a feedback loop based on a load on the agitator or a temperature of the medium or a temperature of the exhaust." | mechanical or electrical device that can moderate flow of fluid | Claims 1, 16, 17, 19 [D.E. 74, Ex. A] |

Defendants submit that the term should be afforded its plain and ordinary meaning, subject to a critical clarification grounded in the prosecution history. Specifically, Plaintiff expressly distinguished the claimed "control valve" from other control valves in prior art when prosecuting the '868 Patent. In doing so, it limited the scope of this term. The Court's construction should reflect this distinction that the patentee ascribed to the term. *Omega Eng'g Inc.* 334 F.3d 1314 (Fed. Cir. 2003) ("where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.") Indeed, during the reexamination of the '868 Patent, Plaintiff distinguished its invention from the Wisniewski prior art reference by explaining that "in Wisniewski, the valve is merely controlled based on a feedback loop based on a load on the agitator or a temperature of the medium or a temperature of the exhaust. The valve in Wisniewski is not used to control a sufficient amount of the liquefied gas to produce a visible amount of cryogenic vapor…" *See,* Exhibit D, Page 10-11. By distinguishing Wisniewski on this basis, Plaintiff made clear to the USPTO and the public that its claimed "control valve" is not a valve that is controlled through a feedback control system tied to operational conditions such as agitator load or temperature. Accordingly, the Court should construe "control valve" according to a plain and ordinary meaning, such as a mechanical or electrical device that can moderate fluid flow, but providing the Plaintiff's own limitation of the term to exclude any control valve that is "controlled based on a feedback loop based on a load on the agitator or a temperature of the medium or a temperature of the exhaust." This construction reflects both the ordinary meaning of the term and the scope of the invention as defined during reexamination.

Additionally, or alternatively, even if the Court is not persuaded that the Plaintiff has "clearly and unequivocally" disclaimed the broader interpretation, the Court of Appeals for the

Federal Circuit has made clear that a court need not determine that a patentee's statements rise to the level of a disclaimer in order to issue a construction "narrower" than the plain and ordinary meaning. *See, e.g., AstraZeneca AB v. Mylan Pharm. Inc.*, 19 F.4th 1325, 1335 (Fed. Cir. 2021). "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015). "Accordingly, even in the absence of a clear and unmistakable disavowal, . . . the prosecution history can be evaluated to determine how a person of ordinary skill would understand a given claim term." *Aptalis Pharmatech,Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018*). See also*, *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005)("[a] party is . . . not entitled to a claim construction divorced from the context of the written description and prosecution history.") Thus, a narrower interpretation is required here to avoid the "wax nose" public policy concern that arises when a patentee "bends" its nose one way to obtain a patent, but bends it another to unfairly capture non-infringing activities. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history, and treat the claims as a 'nose of wax.'")

**C. Claim Term 3: *"Selectively Dispense"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| The operator of the mechanical mixer chooses whether to dispense the cryogenic liquefied gas or not. | Plain and Ordinary Meaning - to deliver more than one amount | Claim 1 [D.E. 74, Ex. A] |

Plaintiff proposes that the phrase "selectively dispense" should be afforded its plain and ordinary meaning with a stipulation of "to deliver more than one amount." So, it is unclear whether Plaintiff has requested that the Court construe this term. However, the intrinsic record

demonstrates that the phrase refers to the operator's ability to control whether cryogenic liquefied gas is dispensed into the container, and therefore benefits from clarification by the Court.

The relevant limitation reads "using a control valve to selectively dispense a cryogenic liquefied gas…" Accordingly, the Court should interpret this term in the context of a "control valve," which, as demonstrated above, excludes those controlled by a feedback loop. The conclusion, then, is that the operator must choose whether to dispense the cryogenic liquefied gas. This construction is reinforced by a claim element recited later in independent claim 1, "wherein a sufficient amount of the liquefied gas controlled by the control valve is introduced into the container to produce a visible amount of cryogenic vapor flowing from the open top of the container." This element sets forth a condition for dispensing liquefied gas - the production of a "visible amount of cryogenic vapor flowing from the open top of the container." This condition is perceived by the operator, who must choose whether to dispense liquefied gas based on the condition. Further, the specification explains that a cryogenic tank supplies liquefied gas through a line that extends to the container and that "a control valve 20 is provided to selectively control the flow of the liquefied gas from the tank 16 to the container 12." '868 Patent 2:53–56. This detail confirms that the operator determines whether liquified gas is delivered into the container.

Plaintiff's proposal to apply the phrase's "plain and ordinary meaning" and/or "to deliver more than one amount" provides little guidance to the Court regarding dispensing described in the patent. Rather, the intrinsic record makes clear that dispensing occurs through a controllable valve that determines whether cryogenic liquefied gas is delivered into the container. Construing the phrase consistent with this disclosure clarifies the functional operation described in the claims without importing additional limitations. Accordingly, because the specification describes

dispensing as occurring only when the flow of liquefied gas is selectively permitted through a control valve, the Court should adopt Defendants' proposed construction of "selectively dispense."

### D. Claim Term 4: ***"Line"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| A conduit positioned between a cryogenic tank and a container for supplying cryogenic liquefied gas from the tank to the container, the conduit not being configured or intended to direct, deflect, or manage vapor or condensation. | a fluid conduit | Claims 1, 19 [D.E. 74, Ex. A] |

The Parties dispute whether Defendants' accused system includes a structure configured, dimensioned, or intended to direct, deflect, or manage vapor. As demonstrated in Exhibit C, Plaintiff asserted that the Defendants' liquid nitrogen conduit acts as a deflector. As such, Defendants seek a specific construction of the term "line," grounded in intrinsic evidence (and confirmed by extrinsic evidence) which excludes additional elements defined by other claim language, and that would improperly broaden the scope of the term by importing features not present in the term. *See e.g. SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337 (Fed. Cir. 2001) (construing a claim term in view of the specification to exclude a specific structure when the specification described the term in a specific way and disclaimed the alternative configuration); *see also Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1281, 1288 (Fed. Cir. 2009) ("Thus this court may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, when the claims themselves, the specification, or the prosecution history clearly indicate that the invention encompasses no more than that confined structure or method.")

First, the claims themselves make clear that a line is used to dispense (or supply) cryogenic liquefied gas from a cryogenic tank into a container. Claims 1, 19 of D.E. 74, Ex. A; Claim 1 of D.E. 74, Ex. B. The explicit language thus supports Defendants' proposal. To this end, it is clear

that the claims do not treat the "line" as including vapor or condensation-management structure beyond a conduit for supplying liquefied gas.

Second, the specification also explains that the line is positioned between a cryogenic tank and a container, and inherently teaches that the line will serve as a conduit for transporting or supplying cryogenic liquified gas from the tank to the container. Col. 2, Lines 46-62 of D.E. 74, Ex. B. No disclosure discusses the line as including vapor or condensation-management structure beyond a conduit for supplying liquefied gas.

Third, Defendants provide the Declaration of Dr. Kevin Keener which supports Defendants' proposed construction. Exhibit E. Dr. Keener mentions a line to potentially have "specific mechanisms thereon or therein, such as valves, nozzles, and plumbing for controlling the liquid as it travels from the tank to the opening to container." Exhibit E. These valves, nozzles, and plumbing may be used to control delivery characteristics of the liquefied cryogenic gas and to ensure safe, directed transfer of the liquid into the container; however, such mechanisms for directing or managing a substance do not form part of the "line" itself, and the term "line" should therefore be construed as not including vapor or condensation management structures. Exhibit E.

On the other hand, Plaintiff's proposal, "a fluid conduit" is similar to a portion of Defendants', but far too broad and at odds with the intrinsic record. The claims and specification consistently describe the "line" as a conduit extending between the cryogenic tank and the container for supplying liquefied cryogenic gas, and Plaintiff's construction would improperly expand the term to encompass any generic fluid conduit, including structures unrelated to the claimed cryogenic gas delivery system.

**E. Claim Term 5: *"Vapor"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|

| | | |
|---|---|---|
| The non-visible gaseous phase of a substance resulting from the phase transition of a liquid to a gas | visible cold cloud | Claims 1, 8, 9, 10, 14, 15 19 [D.E. 74, Ex. A] |

Defendants contend "vapor" is the ***non-visible*** gaseous phase of a substance following a liquid-to-gas phase transition, whereas Plaintiff contends it is a ***visible*** cold cloud. Ultimately, the term is capable of carrying multiple meanings depending on context and scientific usage, and as such, the Court should carefully evaluate both the intrinsic record and the relevant extrinsic evidence to determine how a person of ordinary skill in the art would understand the term at the time of the invention. *See O2 Micro*, 521 F.3d at 1361. Here, extrinsic evidence may be most helpful in assisting the Court by providing background on the technology at issue, explaining the relevant scientific principles, and establishing how the particular term is understood within the pertinent technical field. See *Teva Pharm. USA, Inc.*, 574 U.S. 318, 331 (2015). Ultimately, Defendants' construction more accurately reflects the meaning in the relevant technical field.

Beginning with the intrinsic evidence, however, Plaintiff's proposal finds no support. The claims merely describe "a sufficient amount of the liquefied gas" being introduced into the container "***to produce a visible*** amount of cryogenic ***vapor***…" which does not define vapor itself as visible. At most, the claim language suggests that vapor might become visible under certain conditions, such as if a "sufficient" amount of the liquefied gas is introduced into the container. The specification likewise does not support vapor as a visible cold cloud, particularly because clouds and vapor are distinguished in the specification. For example, the "Summary of the Invention" explains: "… the container has at least an opening or plurality of openings sufficient to enable ***clouds*** of ***vapor*** to pass from the container to the surroundings. The ***clouds*** are produced during the ice cream making process… ." '868 Patent, 1:39-46. This language distinguishes the clouds produced during the process from the underlying vapor itself. The specification does describe an observable phenomenon during operation, stating that customers can see and even

touch "cold ***clouds*** of ***vapor***." But these passages do not define "vapor" as a visible cold cloud. Instead, the specification's reference to "clouds of vapor" or "vapor clouds" indicates that the cloud is a phenomenon associated with the vapor rather than the vapor itself, and the patent provides no explanation of how vapor itself would inherently become visible. Moreover, the specification refers to vapor in multiple operational contexts, describing vapor being generated, flowing from the container, directed laterally by a deflector, and drifting downward along the sides of the container, without ever defining the term as inherently visible. *See e.g.*, '868 Patent, 3:4-19. As such, because the intrinsic record does not provide enough information to define "vapor" in a plain and ordinary fashion or resolve the Parties' competing interpretations, the Court may appropriately look to extrinsic evidence to determine how a person of ordinary skill in the art would understand the term in the relevant scientific field. *O2 Micro*, 521 F.3d at 1361.

Extrinsic scientific evidence confirms that Defendants' proposed construction reflects the meaning a person of ordinary skill in the art would attribute to the term "vapor." As explained by Defendants' expert, Dr. Keener, a POSITA would understand "vapor" in systems utilizing cryogenic gases to refer to the gaseous phase of a substance produced when a liquid undergoes a phase transition under the relevant operating conditions. Exhibit E. In the context of the asserted patent, this occurs when liquid nitrogen transitions from its liquid phase to its gaseous phase upon exposure to ambient temperature and pressure conditions. Exhibit E. Consistent with this understanding, scientific literature defines vapor as the gaseous phase of a substance that exists in equilibrium with its liquid or solid phase. Under this definition, vapor consists of dispersed gas molecules that do not inherently scatter visible light and therefore are generally not visible to the human eye. Exhibit E.

Dr. Keener explains that the visible "cloud" observed in cryogenic systems is not the vapor itself, but rather condensed atmospheric moisture. Exhibit E. When released into ambient air, liquid nitrogen rapidly cools the surrounding air, causing water to condense into droplets or ice particles that form the visible cloud or mist. Exhibit E. Thus, the visible part of a cloud consists of condensed water droplets or ice crystals, rather than the gaseous nitrogen itself (*i.e.* vapor) produced during vaporization. Exhibit E; *see also* Vapor, Wikipedia, https://en.wikipedia.org/wiki/Vapor (last visited Mar. 4, 2026) (provided as Exhibit F).

Accordingly, a POSITA would understand that the term "vapor," as used in the patent, refers to the invisible gaseous phase of the cryogenic substance rather than the visible condensation cloud that may form in the surrounding atmosphere, and the Court should adopt Defendants' proposed construction of "vapor."

**F. Claim Term 6: *"Cryogenic Vapor"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| Vapor of a cryogen that is formed when a cryogenic liquid undergoes vaporization upon exposure to ambient atmospheric conditions | vapor from a cryogen | Claims 1, 19 [D.E. 74, Ex. A] |

As an initial matter, the term "cryogenic vapor" appears only in the claims of the '868 Patent and is not otherwise discussed or defined in the specification. The intrinsic record therefore provides little guidance regarding the precise meaning of the term. As the phrase incorporates the disputed term "vapor," the Parties propose materially different constructions given the above, and, therefore, the Court may appropriately consider extrinsic evidence to determine how a person of ordinary skill in the art would understand the term in the relevant scientific field at the time of the invention. *See O2 Micro*, 521 F.3d at 1361. Indeed, much of the analysis applicable to the construction of "vapor" applies equally here, as the phrase "cryogenic vapor" simply describes vapor associated with a cryogenic substance (and both Parties agree on this as both Parties at least

partially define "cryogenic vapor" as "vapor from/of a cryogen). Accordingly, the Court should construe the term in a manner consistent with the scientific meaning of vapor discussed above and as understood in the field of cryogenic systems.

The extrinsic scientific evidence further confirms that Defendants' construction reflects how a person of ordinary skill in the art would understand the phrase "cryogenic vapor." As explained by Defendants' expert, a POSITA would understand "cryogenic vapor" to refer to the gaseous phase of a cryogenic liquid, such as liquid nitrogen, that has recently transitioned from its liquid phase to its gas phase and therefore remains at an extremely low temperature relative to ambient conditions. Exhibit E. Consistent with the scientific meaning of "vapor" discussed above, Dr. Keener further explains that cryogenic vapor, like vapor generally, does not inherently scatter visible light and therefore is not itself visible to the human eye. Exhibit E. Rather, any visible cloud commonly observed in cryogenic systems results from condensation of atmospheric moisture caused by the extreme cooling associated with the cryogenic process, not from the cryogenic vapor itself. Exhibit E. Accordingly, a POSITA would understand the phrase "cryogenic vapor" to describe gas produced from a cryogenic liquid exposed to atmospheric conditions, rather than a visible substance or "cloud," and the Court should adopt Defendants' proposed construction.

### G. Claim Term 7: <u>*"Bottom Surface"*</u>

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| A structure at the base of a mixer to physically contact and support the container | Plain and Ordinary | Claim 1 [D.E. 74, Ex. A] |

Plaintiff contends the term should be afforded its plain and ordinary meaning, while Defendants propose construing the term. The claim language itself demonstrates why Plaintiff's proposal is flawed. The claim recites "a support having a ***bottom surface*** positioned on a work surface, the ***bottom surface*** <u>being configured to support the container</u>." Claim 1[D.E. 74, Ex. A].

Under Plaintiff's interpretation plain and ordinary meaning, the term "bottom surface" would be limited to a surface on the bottom of a support, but does not explain how the ***bottom surface*** would be "configured to support the container." To that end, no further explanation within the specification exists to gain context as to the term "bottom surface," as the specification makes no mention of the term. Rather, the specification explains that the container rests on a base that includes a heating element used to prevent the ingredients from freezing to the container during the ice cream making process. As described in the specification, "a preferred form for the heating arrangement is an electric resistance heating element in ***a base on which the container for the ice cream rests***," and the container contacts this base such that heat is transferred to the container. In other words, the specification identifies the structural component responsible for supporting the container, namely the base of the mixer assembly, which also rests on the work surface. "It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. … But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *E.I. Du Pont*, 849 F.2d 1433 (Fed. Cir. 1988). To be clear, Defendants are not suggesting that the heating element be read as a limitation of the claim. Rather, the proper construction of this limitation is one in which the container physically contacts the bottoms surface, in order to permit heat transfer by conductance from the heating element in the base to the container. Accordingly, construing "bottom surface" consistent with Defendants' proposal resolves the internal inconsistency created by Plaintiff's interpretation and aligns the claim language with the structural arrangement described in the specification.

### H. Claim Term 8: ***"The bottom surface being configured and dimensioned to support the container above the work surface"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|

| | | |
|---|---|---|
| The structure at the base of a mixer to physically contact and support the container, the structure resting upon a horizontal surface, such as a countertop or table. | the lowermost surface is capable of maintaining the container above the work surface | Claim 1 [D.E. 74, Ex. A] |

The dispute regarding the phrase "the bottom surface being configured to support the container above the work surface" flows directly from the Parties' competing interpretations of the term "bottom surface" as described above. As such, Plaintiff necessarily proposes a construction grounded in the term "bottom surface's" "plain and ordinary meaning." But Plaintiff's construction suffers from the same defect identified above. By defining the "bottom surface" as the "lowermost surface," Plaintiff's proposal does not reconcile a bottom surface or lowermost surface that interfaces with the work surface while also being capable of maintaining the container above the work surface, as the claim so requires.

Defendants' construction resolves this inconsistency by clarifying the structural relationship described in the claim. Under Defendants' proposal, the phrase refers to the structure at the base of the mixer that physically contacts and supports the container while the structure itself rests upon a horizontal surface such as a countertop or table. This interpretation aligns with the claim language and specification, which describes the base of the mixer as being positioned on the work surface while also supporting the container (as described above).

### I. Claim Term 9: ***"Mixing sufficient liquefied gas to surround at least most of the container"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| Either liquified gas being introduced into a container such that the gas overflows from the container or dispensing gas around the container's exterior, or having a cloud or fog surround the container through the introduction of liquified gas into the container. | mixing in enough liquified gas to create vapor that reduces the visibility of the container in some degree or measure. | Claim 7 [D.E. 74, Ex. B] |

Defendants propose a construction that reflects the way a person of ordinary skill in the art would understand how liquefied cryogenic gas could physically surround a container during operation of the system, whereas Plaintiff proposes construing the phrase in a manner that relies on its interpretation of "vapor" as a visible cold cloud, an interpretation that is unsupported by the intrinsic record and inconsistent with the scientific meaning of vapor as discussed above. With respect to the instant phrase, intrinsic evidence does not clearly define how ***liquefied gas*** must "surround" the container or specify the physical mechanism by which this occurs, nor the ***sufficient*** amount that would allow for "surrounding at least most of the container." Indeed, there is no additional claim language to assist in defining these terms, and the intrinsic record only provides a de minimis level of context. *See* '868 Patent 3:3-19. As the Parties have such vastly different proposals, specifically because Plaintiff relies on its definition of "vapor," and because intrinsic evidence is essentially silent on the matter, the Court may appropriately consider extrinsic evidence to determine how a person of ordinary skill in the art would understand the phrase in the relevant technical field. *See O2 Micro*, 521 F.3d at 1361.

As such, extrinsic evidence confirms that a POSITA would understand this limitation to encompass multiple scientifically plausible mechanisms by which liquefied cryogenic gas may surround a container during operation. As explained by Defendants' expert, a POSITA could interpret the limitation to require that liquefied gas be introduced in a manner that causes the container itself to be physically surrounded by the liquefied gas or by liquefied gas flow. Exhibit E. For example, a POSITA could understand the limitation to be satisfied where liquefied gas is introduced into the container in sufficient quantity that it overflows or spills from the container and flows around the outer surfaces of the container, or where liquefied gas is dispensed or directed in a manner that circulates the liquefied gas around the container's exterior. Exhibit E.

Dr. Keener further explains that a POSITA could also interpret the limitation to be satisfied where the introduction of liquefied gas produces condensation that forms a surrounding cloud or fog around the container. Exhibit E. As discussed above with respect to the term "vapor," the visible cloud commonly observed in cryogenic systems is not the vapor itself but rather condensed atmospheric moisture caused by the extreme cooling associated with the boiling cryogenic liquid. Exhibit E. Under this understanding, introducing sufficient liquefied gas into the container may produce condensation that surrounds the container in the form of droplets or ice particles suspended in the surrounding air, not "vapor" as Plaintiff so proposes. Exhibit E.

Accordingly, a POSITA would understand the phrase "mixing sufficient liquefied gas to surround at least most of the container" to encompass configurations in which liquefied gas itself surrounds the container, as well as configurations in which condensation generated from the cryogenic process forms a surrounding cloud around the container.

### J. Claim Term 10: ***"Deflecting laterally"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| Redirecting some or all of the flow of a moving gas from a generally vertical or upward-downward direction, into a generally horizontal or radially outward direction relative to a deflector. | impeding something from moving in a straight direction | Claims 8, 14, 15, 19, 20, 21 [D.E. 74, Ex. A] |

Plaintiff proposes a construction that is far too broad and clearly contradicted by the intrinsic record, whereas Defendants' proposed construction is derived directly from, and consistent with, the intrinsic record. The relevant claim limitation reads "deflecting laterally vapor rising from the container using a deflector…" in all of the relevant claims. The dispute regarding the scope of "deflecting laterally" (as well as "deflector" discussed below) arises from the Plaintiff's farfetched characterization of Defendants' liquid nitrogen delivery conduit as a "deflector" that is capable of "deflecting laterally" the vapor rising from the container, despite the

asserted patent clearly showing that the deflector is a dedicated piece of equipment that is distinct from the claimed "line" that delivers liquefied gas to the container. *See* Exhibit C, pages 12-31. The attempt to stretch this claim limitation far beyond not only its ordinary meaning, but its specifically contemplated purpose in the patent, should not be lent credence.

Beginning with the specification, the patent repeatedly describes the deflector as redirecting vapor that would otherwise rise ***upward*** from the container. In the "Summary of the Invention," the patent explains that "a deflector is positioned just above the open container to direct the clouds of vapor ***laterally*** at the top of the container, thereby keeping the clouds low, around the container rather than permitting them to ***rise*** away from the container." '868 Patent 1:45-51. This passage makes clear that the function of the deflector is to change the direction of vapor flow, from ***rising vertically away*** from the container to moving ***laterally*** around the container. *Id.*

The Detailed Description reinforces this understanding. The specification explains that vapor generated in the container "tends to ***rise*** out of the bowl," and that the apparatus therefore includes a deflector positioned above the container opening. '868 Patent 3:3-26 (emphasis added). The deflector "directs the generated vapor ***laterally*** and, thus, ***keeps it from moving up and away from the container***." *Id* (emphasis added). The specification further explains that after the deflector redirects the vapor ***laterally outward*** from the container, the vapor then drifts downward along the sides of the container. *Id*. These descriptions consistently portray "deflecting laterally" as a redirection of the flow of vapor from an upward direction into a lateral outward direction relative to the container.

Plaintiff's proposal does not capture this redirection. Defining the phrase merely as "impeding something from moving in a straight direction" would encompass any obstruction that slows or interferes with motion, even if the flow were not redirected ***laterally*** at all. The

specification, however, makes clear that the deflector's role is not simply to impede vapor, but to redirect it outward around the container. *Id*.

Although the intrinsic record itself sufficiently explains the meaning of the phrase, extrinsic evidence further confirms that Defendants' proposed construction reflects how a person of ordinary skill in the art would understand the term in the context of fluid flow. As explained by Dr. Keener, a POSITA would understand "deflecting laterally" to refer to redirecting most or all of the flow of a moving gas or vapor from a generally vertical or upward-downward direction into a generally horizontal or radially outward direction relative to a deflector. Exhibit E. From a fluid dynamics perspective, deflection occurs when a physical structure intercepts the flow of gas traveling in one direction and imposes a change in momentum that redirects the flow in another direction, typically perpendicular to the incoming flow. Exhibit E. Dr. Keener further explains that in cryogenic systems, gas would typically flow upwards, where "effective" ***lateral*** deflection requires that the moving gas contact the deflection structure such that the device actively redirects the vapor flow rather than merely obstructing it. Exhibit E.

Accordingly, both the intrinsic evidence and the relevant scientific understanding confirm that "deflecting laterally" refers to redirecting the direction of vapor flow from an upward direction to a direction outward from the container rather than merely impeding movement. The Court should therefore adopt Defendants' proposed construction.

### K. Claim Term 11: ***"Deflector"***

| Defendants' Proposal | Plaintiff's Proposal | Relevant Claims |
|---|---|---|
| A physical structural element specifically configured and positioned to intercept gas or vapor flow and actively redirect that flow in a different direction. | structure that impedes the straight movement of something | Claims 8, 14, 15, 19, 20, 21 [D.E. 74, Ex. A] |

While Plaintiff proposes defining the term broadly as a "structure that impedes the straight movement of something," Defendants' proposed construction reflects how the term is used in the

claims and described throughout the specification. Beginning with the claim language, the claims recite "deflecting laterally, vapor rising from the container using a ***deflector*** mounted to the powered mixer and positioned above the open top of the container." [D.E. 74, Ex. A] (emphasis added). Thus, the claims themselves make clear that the deflector is a structural component positioned above the container and used to interact with vapor rising from the container in order to redirect its movement.

For much of the same reasons described in the section above relating to "deflecting laterally," the specification confirms this understanding. In the "Summary of the Invention," the patent explains that "a deflector is positioned just above the open container to direct the clouds of vapor laterally at the top of the container, thereby keeping the clouds low, around the container rather than permitting them to rise away from the container." '868 Patent 1:45–51. This description makes clear that the deflector is a structural element intentionally positioned to redirect the direction of vapor flow from rising vertically away from the container to moving laterally around the container, rather than just impeding the straight movement of something. In fact, no portion of the specification makes use of the terms "impeding" or "straight movement." As such, defining a deflector merely as a structure that "impedes the straight movement of something" would be overbroad, and encompass any object that obstructs motion, even if it does not redirect the flow at all. Figures 1 and 3 of the '868 Patent also depict the deflector (reference numeral 22) as a large disk-shaped element set closely over the top of the container.

Additionally, the Plaintiff's proposal for "deflector" and "deflecting laterally" would mean that any object positioned above the container would satisfy these claim limitations. Figure 1 of the '868 Patent shows both the mixing head of a powered mixer 14 and the line 18 positioned above the container. Under Plaintiff's proposal, both of these features would qualify as

"deflectors" and "deflect laterally" because they would impede the straight movement of a vapor rising underneath them. However, this result incongruous because it begs the question of why, if the other elements above the container provided sufficient deflection, did the Plaintiff also incorporate a purpose-built deflector? The question is rhetorical, of course, because the purpose of the deflector is not merely to "impede" vapor, but to redirect the "clouds [that are] produced during the ice cream making process" around the container and toward the customer "creating an unusual, pleasing spectacle and entertaining the customer." '868 Patent, column 1, lines 42-44.

Although the intrinsic record itself sufficiently explains the meaning of the term and supports Defendants' proposed construction thereof, extrinsic evidence further confirms that Defendants' proposed construction reflects how a person of ordinary skill in the art would understand the term in the context of fluid flow. As explained by Dr. Keener, a POSITA would understand a deflector to refer to a physical structural element configured and positioned to intercept a moving gas or vapor flow and actively redirect that flow in a different direction. Exhibit E. From a fluid dynamics perspective, a deflector is not merely any object located near a flow path, but a structure deliberately positioned and dimensioned to interact with the flow and impose a change in momentum and direction. Exhibit E.

Accordingly, both the intrinsic evidence and the relevant scientific understanding confirm that a "deflector" is a structural component intentionally configured and positioned to intercept and redirect vapor flow. The Court should therefore adopt Defendants' proposed construction.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt Defendants' proposed constructions and reject those set forth by Plaintiff.

**Date: March 13, 2026**

Respectfully submitted,

/W. John Eagan/
W. John Eagan
Florida Bar No. 105,101
johneagan@malloylaw.com
Victor A. Bruzos
Florida Bar No. 1,049,014
vbruzos@malloylaw.com

**MALLOY & MALLOY P.L.**
2800 S.W. Third Avenue
Miami, Florida 33129
Telephone (305) 858-8000

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on **March 13, 2026,** a true and correct copy of the foregoing was electronically filed with the Clerk of The Court using the CM/ECF system, which will then send a notification of such filing to the following attorneys of record:

- **Bryn Aaron Peterson, I**
  bryn.peterson@brynpetersonlaw.com
- **Thomas Herbert Stanton**
  tstanton@bochner.law
- **Ishmael Anthony Green**
  igreen@bochner.law
- **Joseph A. Farco**
  jfarco@bochner.law

/W. John Eagan/
W. John Eagan